INVESTORS RESEARCH CORPORA-
TION and James E. STOWERS,
Petitioners,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

Richard H. DRIEHAUS, Petitioner,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

Nos. 78–1589, 78–1597.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 28, 1979.

Decided April 29, 1980.

As Amended June 11, 1980.

Certiorari Denied Oct. 20, 1980.
See 101 S.Ct. 317.

Irving Kuraner, Kansas City, Mo., for petitioner in No. 78–1589.

Monroe H. Freedman, Hempstead, N. Y., for petitioner in No. 78–1597.

Jacob H. Stillman, Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C., with whom William A. Dietch, Asst. Gen. Counsel, Rosalind C. Cohen, Sp. Counsel, Securities and Exchange Commission, Washington, D. C., were on brief, for respondent.

Leonard J. Theberge, Washington, D. C., was on brief for amicus curiae urging the order of censure to be vacated.

Also Judson H. Gould, Washington, D. C., entered an appearance for appellant in No. 78–1597.

Also Alan Rosenbalt, Atty., Securities and Exchange Commission, Washington, D. C., entered an appearance for appellee.

Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge and TAMM, Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Petitioners Investors Research Corporation ("Investors Research"), James Stowers, and Richard Driehaus seek review of a Securities and Exchange Commission order censuring them for violating section 17(e)(1) of the Investment Company Act of 1940.[1] We affirm the Commission's order as to petitioners Stowers and Investors Research, but as to petitioner Driehaus, who was found liable for aiding and abetting the principal violation, we vacate the Commission's order and remand for further consideration of the question of scienter.

## I. BACKGROUND

### A. *The Facts.*

The Commission's findings of fact, which are fully supported by the record, are as follows:

Twentieth Century Investors, Inc. ("Twentieth Century" or "the Fund"), is a mutual fund registered under the Investment Company Act which since 1958 has been managed by petitioner Investors Research. Petitioner Stowers is the president, portfolio manager and majority stockholder of Investors Research, as well as president of Twentieth Century.[2] In this joint capacity, Stowers attends to the day-to-day management of the Fund, including the selection of brokerage firms to execute the Fund's portfolio transactions. Petitioner Driehaus is a broker, and during the period relevant to this proceeding was associated with three different brokerage firms working for Twentieth Century: A.G. Becker & Co. ("Becker & Co."); Mullaney, Wells & Co. ("Mullaney, Wells"); and Olde & Co.[3]

In 1970, when Investors Research and Stowers first became Twentieth Century's

---

**1.** 15 U.S.C. § 80a–17(e)(1) (1976). Section 17(e)(1) provides:

(e) It shall be unlawful for any affiliated person of a registered investment company, or any affiliated person of such person—
(1) acting as agent, to accept from any source any compensation (other than a regular salary or wages from such registered company) for the purchase or sale of any property to or for such registered company

or any controlled company thereof, except in the course of such person's business as an underwriter or broker.

**2.** Joint Appendix (J.A.) 14–15.

**3.** From the Spring of 1968 until July 1973, Driehaus was employed by Becker & Co. as a stockholder and later as assistant vice president. J.A. 277–88. In August 1973, Driehaus

portfolio managers, as many as twenty different brokerage firms executed transactions for the Fund.[4] One of these firms was Becker & Co., whose account with Twentieth Century was handled by petitioner Driehaus. During the next three years, a close professional relationship developed between Stowers and Driehaus, and an ever-increasing amount of the Fund's business was directed to Becker & Co. By August of 1973, the great majority of Twentieth Century's portfolio transactions were executed by Becker & Co.[5]

At the same time, Stowers and Driehaus were experimenting with techniques to identify undervalued securities. They soon found that the method of analysis which they deemed useful could not be performed efficiently by hand or with small calculators. Stowers determined that a computer would be necessary, and though he had no prior experience in computer operations, set out by himself to develop a computer system. He studied programming, contracted with International Business Machines, Inc. ("IBM") for the necessary hardware, and by the summer of 1973 completed a system consisting of 30 programs and a data bank containing information on some 6500 stocks.[6]

To create his system, Stowers was required to pay IBM $15,000 in development costs, and also faced monthly operating costs of $6000.[7] He informed Driehaus that he needed someone to offset this financial burden, and persuaded him to assist in approaching Becker & Co. to purchase access time to the system. Despite their combined efforts, however, Becker & Co. rejected Stowers' offer on the ground that the system would not be of value to its business.[8] Shortly thereafter, Chicago Corporation, another broker-dealer, rejected a similar offer by Stowers.[9]

Mullaney, Wells, which at the time received very little of Twentieth Century's business, was the third brokerage firm contacted by Stowers. In July 1973, Stowers met with John Kieft, an officer and director of Mullaney, Wells, ostensibly for a demonstration of Stowers' computer system. Kieft later testified, however, that from the point of view of his firm, a principle purpose of the meeting was to secure the Fund's brokerage business.[10] During this "demonstration," in fact, Stowers gave Kieft lengthy and detailed instructions concerning the manner in which Twentieth Century's orders were properly executed.[11]

Stowers' discussions with Mullaney, Wells bore fruit on August 1, 1973, when Mullaney, Wells agreed to pay Stowers and In-

---

left Becker & Co. to join Mullaney, Wells, where he served as a director and also held a twelve to fifteen percent equity interest. In August 1974, when Olde & Co. took over Mullaney, Wells' accounts, Driehaus transferred to Olde & Co. J.A. 99–102.

**4.**  J.A. 71,223.

**5.**  In 1971, Becker & Co. received 47.9% of the total commission dollars paid by the Fund, and executed 75.3% of the Fund's total principal transactions. By August 1, 1973, Becker & Co. received 95% of the total commission dollars and 86.5% of the total principal transactions. J.A. 474.

**6.**  J.A. 35,413.

**7.**  J.A. 26–27.

**8.**  J.A. 30.

**9.**  Stowers testified before an administrative law judge that Chicago Corporation was "very impressed" by the system, but was unwilling to pick up the initial $15,000 costs of the computer. J.A. 31–32. He conceded, however, that Chicago Corporation asked him "how much brokerage business they were going to get [from Twentieth Century] if they bought [the system]." Stowers claims he replied that the system was unrelated to placement of the Fund's business. J.A. 31–32.

**10.**  J.A. 258.

**11.**  Stowers testified that he instructed Kieft to place transactions on either an agency or a principal market maker basis only. Kieft was also shown a copy of the Fund's prospectus, and was instructed as to how certain portions should be worded. Various problems which the Fund had been having with the SEC were also discussed. In general, Stowers testified that he duplicated the instructions under which Becker & Co. had been operating. J.A. 219–221.

vestors Research $15,000 initially, and continuing monthly payments of $6000, professedly for access to the computer system.[12] On the same day, Driehaus left Becker & Co. to become research director for Mullaney, Wells, where he was given full responsibility for handling the Twentieth Century account.[13] Thereafter, virtually all of the Fund's brokerage business was moved by Stowers to Mullaney, Wells, quickly making Twentieth Century the brokerage firm's largest and most important customer.[14] Mullaney, Wells, in turn, remained Stowers' only computer customer, since all further efforts to sell access to the system were unsuccessful.[15]

Despite the profitability of its Twentieth Century account, Mullaney, Wells soon found itself in precarious financial condition. Setbacks in other parts of its business forced the firm to reduce salaries, cancel subscriptions to publications, and otherwise attempt to hold costs down.[16] Yet its payments to Investors Research did not cease. Indeed, Mullaney, Wells continued paying for the computer services, and receiving the Fund's brokerage business, until the firm's deteriorating financial condition forced it out of business on August 12, 1974.[17] On this date, Olde & Co. took over Mullaney, Wells' accounts, including the Twentieth Century business, and hired Driehaus as a broker.[18] It also commenced paying Investors Research $6000 per month—like Mullaney, Wells, ostensibly for computer services.[19]

## B.  Proceedings Below.

On April 22, 1975, the Commission ordered public proceedings to investigate a variety of potential securities law violations by petitioners,[20] including the instant violation of section 17(e)(1) relating to the computer leasing arrangement. An administrative law judge, in fact, found petitioners liable under several anti-fraud statutes as well as the Investment Company Act.[21] As a sanction for these violations, the ALJ ordered the revocation of Investors Research's registration as an investment adviser, and Mullaney, Wells' registration as a broker dealer. He also barred Stowers and

---

12. J.A. 43.

13. J.A. 99.

14. Between August 1, 1973, and December 31, 1973, Mullaney, Wells received 97.6% of the total commission dollars paid out by the Fund and placed 100% of the Fund's total principal transactions. In 1974, Mullaney, Wells received 100% of the total commission dollars paid by the Fund, and placed 99.1 percent of its total principal transactions. J.A. 474. Stowers testified that prior to August 1973, "very little" of the Fund's business went to Mullaney, Wells. J.A. 34

15. Stowers attempted to sell computer services to a number of other brokerage firms, banks, mutual funds, and other institutions which might have desired access rights, but none were willing to pay for the services. J.A. 58-60.

16. The firm had been involved heavily in the municipal bond market, which experienced severe declines. J.A. 259.

17. J.A. 101.

18. Id.

19. Id.

20. In the Matter of Investors Research Corporation, et al. Order for Public Proceedings, File No. 3–4669 (April 22, 1975), J.A. 1.

21. Petitioners were each found to have violated section 17(a) of the Securities and Exchange Act of 1933, 15 U.S.C. § 77q (1976) (fraudulent securities transactions), section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5 thereunder (use of any "manipulative or deceptive device" in connection with a securities transaction), section 206 of the Investment Advisers Act, 15 U.S.C. § 80b–6 (1976) (fraud by an investment adviser), and section 17(e)(1) of the Investment Company Act, 15 U.S.C. § 80a–17(e)(1) (1976).

In addition to the present petitioners, the parties in the administrative proceedings included Mullaney, Wells and Olde & Co. Prior to the decision of the ALJ, Olde & Co. consented to the imposition of a sanction. See Securities and Exchange Act Release No. 11952 (Dec. 24, 1975), 8 SEC Docket 895. Mullaney, Wells was found to have violated section 17(a) of the 1933 Act by the ALJ, and did not appeal that ruling to the Commission. See Securities and Exchange Act Release No. 11952 (Dec. 24, 1975), 8 SEC Docket 895.

Driehaus from ever associating with any broker-dealer or investment adviser again.[22]

### The Commission's Opinion

On review, the full Commission reversed the ALJ's rulings under the anti-fraud statutes, but affirmed the findings—though not the sanctions—under section 17(e)(1).[23] The crux of the Commission's theory was that the payments from the brokerage firms to Investors Research, ostensibly for computer services, were at least in part compensation for the placement of Twentieth Century brokerage business with the firms. As such, the Commission held the payments were "compensation . . . for the purchase or sale of any property to or for [a] registered [investment] company" prohibited under section 17(e)(1).

The Commission began by noting that "had [the computer leasing arrangement] been a simple two-sided relationship" between a mutual fund and its brokers, there would be nothing in section 17(e)(1) to prohibit it.[24] The Fund would receive the benefits of the transaction, and no conflict of interest would arise. The "complex, three-sided" relationship in the instant case, however, was a different matter.[25] Its flaw rested in the diversion of the benefits of the transaction, i. e., the payments for the computer services, to a third party, Investors Research, while the burdens, i. e., the commissions and spreads that Mullaney, Wells collected from Twentieth Century, were borne by the Fund's shareholders. As the Commission stated:

> This divorce of benefit from burden created a situation squarely covered by Section 17(e)(1)'s words and by the basic policy that the authors of those words sought to implement. That policy was, as the Court of Appeals for the Second Cir-

cuit has said, "to prevent affiliated persons from having their judgment and fidelity impaired by conflicts of interest."[26]

The Commission reasoned that once this triangular relationship was created, Stowers was unable to choose the Fund's brokers with complete objectivity as the statute demands.[27]

The Commission next responded to petitioners' claim that the payments made by the brokerage firms were attributable solely to the purchase of computer services, and hence could not be "compensation . . . for" the Twentieth Century brokerage business. The Commission held that the "symbiotic relationship" between the Fund, the Investment Advisers and the brokerage firms was "presumptively suspect," and as such, the burden was on the petitioners to prove that the computer services were worth the entire amount avowedly paid for them.[28] On reviewing the record, the Commission found that petitioners had failed to carry this burden, and it therefore concluded that at least part of the $6000 monthly payments was in return for brokerage business.[29] The violation of section 17(e)(1) was accordingly established.

Unlike the ALJ, however, the Commission ruled that mitigating circumstances justified reducing the sanction imposed on petitioners to censure, the lightest administrative sanction available. The Commission found that petitioners' belief in the computer system was "undoubtedly sincere," and that "their belief that the law permitted them to [engage in the transactions] may well have been entertained in good faith."[30] Since this was not "a garden variety kickback case" nor a case of "a 'cunning device' fashioned for the sole purpose of advancing

---

**22.** J.A. 317–19.

**23.** In the Matter of Investors Research Corporation, et al., File No. 3–4669 (May 1, 1978) (hereinafter "SEC Opinion") at 3, n.12 (J.A. 341–351).

**24.** Id. at 5.

**25.** Id.

**26.** Id. at 6.

**27.** Id. at 7.

**28.** Id. at 8.

**29.** Id.

**30.** Id. at 10.

the interests of those who invented it," [31] the Commission determined that its remedial purposes would be sufficiently advanced by censure.

## II. ESTOPPEL

Petitioners contend, *inter alia*, that the SEC is estopped from imposing censure because prior to these proceedings "[a]ll the relevant facts [necessary to identify a violation] were fully disclosed to the SEC." [32] They argue that in light of these disclosures the failure of Commission staff members to "suggest that there might be a violation of Section 17(e)" [33] should bar the Commission's present action.

■ The Commission is charged with protecting the public from potential abuses in the securities industry. This, of course, contemplates treating those subject to its regulation fairly.[34]

**31.** *Id.*

**32.** Brief for Petitioner Richard H. Driehaus ("Driehaus Brief") at 8. Petitioners Investors Research and Stowers join the Driehaus Brief.

**33.** *Id.*

**34.** The fundamental principle of equitable estoppel applies to government agencies, as well as private parties. *See* 2 K Davis, Administrative Law Treatise §§ 17.01–17.04 (1958 & Supp. 1980); Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551 (1979). *Compare United States v. Wharton*, 514 F.2d 406 (9th Cir. 1975) (government estopped from claiming ownership of land where Department of Interior advised citizen he could secure ownership through homestead); *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973) (government barred from requiring farmers to repay funds acquired from Department of Agriculture pursuant to erroneous government advice), *with Morris v. Andrus*, 593 F.2d 851 (9th Cir. 1978) (Department of Interior not estopped from cancelling illegal lease where aggrieved party previously failed to notify government of critical circumstances of the leasing arrangement); *United States v. Ruby Co.*, 588 F.2d 697 (9th Cir. 1978) (government not estopped from resurveying lands when that option was announced at time of original survey).

**35.** The first contact occurred on November 26, 1973, when the Fund filed a post-effective amendment to its own prospectus with the Commission. The amendment revealed that an

■ Petitioners' claim is based on a series of filings and meetings with SEC staff members which took place between November 1973 and December 1974.[35] Through these contacts, the Commission clearly learned that Mullaney, Wells was paying Investors Research $6000 per month, ostensibly for computer services. Yet at no time was it revealed that these payments were actually being made, at least in part, in return for favorable consideration in the placement of Twentieth Century's brokerage business. On the contrary, in each contact it was asserted that the $6000 payment was *for* the use of computer services, plainly implying that the services were worth $6000 and were the sole item being purchased by Mullaney, Wells.[36] In these circumstances, without benefit of the additional information it acquired through its public proceedings, the Commission had no duty to challenge the natural implication of petitioners' assertion.[37]

unnamed brokerage firm was purchasing computer services from Investors Research. J.A. 203–04. In early 1974, Stowers received comments from Commission employees recommending some changes in the language of the amendment, but not indicating that the arrangement might violate section 17(e). J.A. 204–05. A document filed with the Commission in December of 1973 identified Mullaney, Wells as the firm purchasing the computer services; the Commission made no response to the filing. J.A. 206.

Twentieth Century's 1974 prospectus, reflecting the Commission's suggestions after the 1973 post-effective amendment filing, disclosed that Mullaney, Wells was paying $6000 per month for the services to Stowers. J.A. 477–78. Later, in two more filings, the payments were again disclosed to the Commission, but still petitioners received no indication that their arrangement might violate section 17(e). J.A. 209–10.

**36.** The 1974 prospectus, for example, described the computer system and then noted: "Mullaney, Wells has subscribed to the service, *for which it pays $6000 per month* to Investors Research." J.A. 478 (emphasis added).

**37.** Thus, this case differs from *Klein v. Securities and Exchange Commission*, 224 F.2d 861 (2d Cir. 1955), the case we have found closest to the present facts. Though not phrased in terms of estoppel, the *Klein* decision barred the Commission and the National Association of Securities Dealers (NASD) from expelling a

## III. THE ALLOCATION OF THE BURDEN OF PROOF

Petitioners next contend the Commission "made a mockery out of any rational concept of the . . . burden of proof"[38] by requiring them to prove that the computer services were worth the $6000 per month ostensibly paid for them. We disagree. The Commission shifted the burden only after learning the full circumstances surrounding the leasing of the computer system, and proving that Stowers had placed himself in a conflict of interest by receiving payments from the brokerage firms while serving as portfolio manager for Twentieth Century.[39] As such, the Commission applied the long-standing principle that once a conflict of interest is proven, the burden shifts to the party in conflict to prove that he has been faithful to his trust.[40] In the context of section 17(e)(1), the specific burden is for the affiliated person to prove that he has received no compensation "for the purchase or sale of any property to or for" the investment company. The Commission correctly found that petitioners were unable to do this.[41]

## IV. THE MEANING OF "ACTING AS AN AGENT"

Section 17(e)(1)'s prohibition extends to affiliated persons of a registered mutual fund if they are "acting as an agent."[42] The statute does not specify for whom the affiliated person must be "acting as an agent," and petitioners rely on this ambiguity to claim that the statute prohibits the receipt of compensation only when the affiliated person acts pursuant *to a formal agency relationship with a third party* dealing with the mutual fund. Petitioners reason that since no formal agency relationship existed between Stowers and Mullaney, Wells, no violation of the Act can be found.

While the language "acting as an agent" is facially susceptible to petitioners' reading, it cannot be read in a vacuum. The Investment Company Act in general, and section 17(e)(1) in particular were designed to prohibit the many varieties of conflicts of interest which have historically plagued the investment company industry.[43] The statute seeks to insure the "independence of management and its fidelity to sharehold-

---

broker/dealer from the NASD because of unreasonable delay in commencing enforcement proceedings. The NASD had waited two years to commence its action after learning *all* the facts critical to establishing Klein's violation during an investigation of Klein *specifically focused* on possible violations of the law he was expelled for breaking. Here, in contrast, there is no evidence the Commission learned all the facts of the violation until its public proceedings; and, to the extent the Commission was previously apprised of some of the circumstances of the computer leasing arrangement, it acquired this information through general filings or routine examinations, rather than a focused inquiry under section 17(e)(1). *See* 15 U.S.C. § 78z (1976) (failure of Commission to act in response to statements in prospectus not prejudicial to later action).

**38.** Driehaus Brief at 49.

**39.** SEC Opinion at 2–3, 7–8.

**40.** *Sheridan v. Perpetual Building Association*, 299 F.2d 463, 465 (D.C.Cir.1962).

**41.** We also reject petitioners' assertion that the Commission improperly applied a "preponderance of the evidence" standard of proof to this action, rather than the higher "clear and con-

vincing" standard. The higher standard is not mandated by *Collins Securities Corp. v. SEC*, 562 F.2d 820 (D.C.Cir.1977), the case petitioners rely on. *Collins* required the higher standard in *fraud* actions where a *severe sanction* is imposed. Since neither one of these elements is found in this case, *Collins* is inapplicable.

**42.** *See* note 1 *supra*. None of the parties challenge that Stowers and Investors Research are "affiliated persons" of Twentieth Century. The textual references to "Stowers" in this section, accordingly, apply as well to Investors Research.

**43.** For a summary of the scandalous conditions which led to the enactment of the Investment Company Act, *see* Note, *The Investment Company Act of 1940*, 50 Yale L.J. 440 (1940). For indications that these abuses still exist on a large scale today, *see* Project, *The Mutual Fund Industry: A Legal Survey*, 44 Notre Dame Law. 732, 812 (1969); Note, *Conflicts of Interest in the Allocation of Mutual Fund Brokerage Business*, 80 Yale L.J. 372 (1970). The legislative history of the Act is ably recounted in *United States v. Deutsch*, 451 F.2d 98 (2d Cir. 1971) (*"Deutsch"*).

ers"[44] by setting forth broad standards prohibiting the wide variety of conflicts which may compromise an affiliated person's judgment. Accepting petitioners' contention would defeat this important congressional purpose.

Nothing in the legislative history of section 17(e)(1) indicates that a formal agency relationship with a third party is required for liability.[45] On the contrary, the statutory language was apparently chosen to prohibit affiliated persons from accepting compensation when they act as agent for either a third party or the mutual fund itself,[46] an interpretation the Commission has accepted for many years.[47]

■ Whether Stowers was acting as an agent for Twentieth Century, as the Commission found, must be viewed in light of his position within the Fund's management structure in order to properly assess the potential harm to shareholder interests should compensation continue. We agree with the Commission the present record demonstrates that Stowers' position in the Fund and concurrent receipt of compensa-

tion did pose a substantial danger to shareholders. As the Commission noted:

> No longer could [Stowers] look at Twentieth Century's brokerage problems with an eye single to Twentieth Century's interests. Now he had an interest of his own at stake. He could not compare the brokerage services that Mullaney offered with those offered by other firms in the wholly disinterested way that the statute contemplates. * * * Stowers' fiduciary duty to Twentieth Century required him to do all that he reasonably could to keep transaction costs down. His self-interest in keeping Mullaney satisfied . . pointed the other way. This made it somewhat less likely that he would drive hard bargains with Mullaney. It also gave him an incentive to churn Twentieth Century's portfolio.[48]

## V.  STATE OF MIND

Finally, petitioners contend the Commission improperly neglected to consider the question of their state of mind concerning the wrongfulness of the computer leasing arrangement. Investors Research and Stowers, who were sanctioned as principals

---

**44.** *Deutsch, supra,* 451 F.2d at 108.

**45.** Petitioners point to only one statement in the entire legislative history of the Investment Company Act in support of their restrictive interpretation. In this brief passage, Mr. David Schenker, Chief Counsel of the SEC Investment Trust Study and a principal draftsman of the Act, noted the problem posed by an affiliated person who acts as real estate agent for an outsider selling property to a fund, and commented that section 17(e)(1) was designed to remedy this situation. He emphasized, however, that the problem with this arrangement was the conflict of interest in which the affiliated person found himself; Schenker did not emphasize the technicalities of agency relationships *per se.* Hearings on S. 3580 before a Subcomm. of the Senate Comm. on Banking and Currency, 76th Cong., 3d Sess. (1940) (hereinafter "Senate Hearings") at 262. It is our view, therefore, that this lone passage does not indicate that the phrase "acting as an agent" was meant to refer only to formal agency relationships with outside parties. Rather, the passage indicates that section 17(e)(1) is designed to prevent conflicts of interest. The agency requirement is designed to limit the class of affiliated persons subject to the statutory prohibition.

**46.** Had Congress wished to limit section 17(e)(1) as petitioners suggest, it could easily have done so by specifying for whom the affiliated person must be acting as an agent. In the absence of any such limiting language, or evidence of the intent ascribed to Congress by petitioners, we cannot interpret the statute in the constrictive fashion which petitioners suggest. ·See *Deutsch, supra,* 451 F.2d at 111–12.

**47.** *See* Arthur Lipper Corp., Securities and Exchange Act Release No. 11773 (Oct. 24, 1975), 8 SEC Docket 273, *modified,* 547 F.2d 171 (2d Cir. 1976); Winfield & Co., Securities and Exchange Act Release No. 9478 (Feb. 9, 1972); Provident Management Corp., Securities and Exchange Act Release No. 9028 (Dec. 1, 1970); Consumer Investor Planning Corp., Securities and Exchange Act Release No. 8542 (Feb. 20, 1969). Of course, we give great weight to these administrative interpretations. *E. I. duPont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234–2235, 53 L.Ed.2d 100 (1977).

**48.** SEC Opinion at 7.

for violating section 17(e)(1), argue that the Supreme Court's decision in *Ernst & Ernst v. Hochfelder*[49] mandates a scienter requirement for liability under the statute. Petitioner Driehaus, who was sanctioned for aiding and abetting the primary violations, argues further that principles intrinsic to the law of accessorial liability require that he, at least, be found to possess some awareness that the leasing arrangement was suspect.[50]

■ As to the principal violators, we find that the *Hochfielder* decision does not mandate a scienter requirement for section 17(e)(1) liability. *Hochfelder* merely held that scienter was an element in a private action for damages under section 10(b) of the Securities and Exchange Act of 1934.[51] The decision was based on the particular statutory language at hand, which, in the Court's words, "clearly connotes intentional misconduct."[52] The same cannot be said of section 17(e)(1). It sets forth a flat ban on certain conduct tending to compromise the fiduciary judgment of affiliated persons. There is no language suggesting a scienter requirement. Indeed, the legislative history of section 17 demonstrates very specifically that Congress did not intend to saddle the Commission with the difficult problem of proving fraudulent or "larcenous intent."[53]

Petitioner Driehaus' liability, however, does not directly flow from the statute.

Section 17(e)(1), by its terms, prohibits only the *receipt* of certain compensation by affiliated persons. The Commission does not contend that Driehaus received any monies at all, nor that he is an affiliated person of Twentieth Century. Instead, the Commission held that, by assisting Stowers in selling the computer system to Mullaney, Wells and Olde & Co., Driehaus *aided and abetted* the primary violations by Stowers and Investors Research.[54]

We are aware of no authority addressing the question of what state of mind is required for liability as an aider and abettor under section 17(e)(1).[55] Courts have frequently considered such requirements for aiders and abettors under anti-fraud statutes, however.[56] We believe the principles developed in these cases apply with equal, if not greater, force in the context of a conflict of interest statute like section 17(e)(1). The awareness of wrong-doing requirement for aiding and abetting liability is designed to insure that innocent, incidental participants in transactions later found to be illegal are not subjected to harsh, civil, criminal, or administrative penalties.[57] This policy is especially germane where the proscribed conduct of the principal may not always appear to be wrongful, as may often be the case under section 17(e)(1).

■ To the extent the Commission concedes a need for any state of mind require-

**49.** 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**50.** Driehaus Brief at 52–53.

**51.** *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**52.** *Id.*

**53.** Senate Hearings, *supra* note 45, at 131.

**54.** Driehaus was prosecuted pursuant to 15 U.S.C. § 80a–9(b)(3) (1964), which provides for administrative sanctions against any person who "has willfully aided, abetted, counseled, commanded, induced, or procured" a violation of the Act by any other person.

**55.** In *Deutsch, supra*, the Second Circuit upheld an aiding and abetting violation of section 17(e)(1), but only in the limited circumstances where the alleged aider and abettor was the

payor of the compensation in question. The court's discussion of whether specific intent to influence was required under the statute, therefore, cannot be regarded as a consideration of the state of mind requirement for section 17(e)(1) aiders and abettors in general.

**56.** *See, e. g., Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975); *Securities and Exchange Commission v. Coffey*, 493 F.2d 1304 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

**57.** *See* Ruder, *Multiple Defendants in Securities Law Fraud Cases*: *Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution*, 120 U.Penn.L.Rev. 597 (1972) (hereinafter "Ruder").

ment at all, it argues that a negligence standard meets the concerns mentioned above. The Commission contends that an accused aider and abettor can be censured whenever he "should have been able to conclude that his act was likely to be used in furtherance of illegal conduct."[58] We do not agree. This standard has previously been used only in civil injunctive actions[59] where the paramount concern is terminating the illegal conduct, not sanctioning wrongdoers. It creates a duty to investigate potential violations of law which "in essence would amount to eliminating [any awareness of wrong-doing] as a necessary element in imposing aiding and abetting liability."[60] Where sanctions can be imposed, the negligence standard provides insufficient protection for those persons whose involvement in securities law violations is in one respect substantial, yet wholly innocent.[61]

In *Woodward v. Metro Bank of Dallas,*[62] the Fifth Circuit fashioned a test for aider and abetter liability which we believe strikes the correct balance between the public interest in enforcing the securities laws and the danger of unduly burdening

the securities industry. The court held that to establish liability, three elements must be proven: 1) another party has committed a securities law violation; 2) the accused aider and abetter had a general awareness that his role was part of an overall activity that was improper; and 3) the accused aider and abetter knowingly and substantially assisted the principal violation.[63]

In assessing petitioner Driehaus' liability, the Commission expressly disavowed the need to make any findings regarding petitioners' knowledge of wrong-doing.[64] Thus, contrary to part two of the *Woodward* test, the Commission failed to consider whether Driehaus had a general awareness that he was assisting Stowers in wrongful conduct, *i. e.*, securing payments from the brokerage firms made, at least in part, for favorable consideration in the selection of Twentieth Century's brokers. This omission has led to a record which contains contradictory indications as to whether Driehaus possessed the needed state of mind.[65] We cannot uphold the Commission's censure of Driehaus amidst these inconsistencies, and therefore we vacate the Commission's order in No. 78–1597 and remand so the Commis-

58. Brief for SEC, Respondents, at 42, *quoting Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 811 (2d Cir. 1975).

59. *Securities and Exchange Commission v. Coven*, 581 F.2d 1020 (2d Cir. 1978); *Securities and Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975). *See also Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 192–93, 84 S.Ct. 275, 283–284, 11 L.Ed.2d 237 (1963) (distinguishing between criminal punishment, administrative sanctions, and injunctive relief).

60. Ruder, *supra* note 57, at 120 U.Penn.L.Rev. 633.

61. Dean Ruder has pointed out that in most cases, an alleged aider and abettor "will merely be engaging in customary business activities, such as loaning money, managing a corporation, preparing financial statements, distributing press releases, completing brokerage transactions, or giving legal advice." Ruder, *supra* note 57, at 120 U.Penn.L.Rev. 632. In a particular case, any of these activities could constitute substantial assistance to the principal wrongdoer, yet any can be performed in complete good faith by an actor totally unaware

that anything improper is occurring. Where the activities of the alleged aider and abettor are in this respect innocent, it would be unjust to utilize secondary liability principles to impose punishment or administrative sanctions as the Commission proposes.

62. 522 F.2d 84 (5th Cir. 1975).

63. 522 F.2d at 94–97.

64. SEC Opinion at 4–5 n.15 & n.16.

65. In its brief, for example, the Commission alleges that "Driehaus was involved in every aspect of the relevant transactions." Brief for SEC, Respondents, at 43. They point to evidence in the record establishing his close relationship with Stowers, his assistance in persuading Mullaney, Wells to purchase access to the computer system, and his knowledge that Becker & Co. lost the Twentieth Century account after refusing to purchase computer services. *Id.* On the other hand, the Commission stated in its opinion that petitioners' "belief that the law permitted them to [engage in these transactions] may well have been entertained in good faith." SEC Opinion at 10. These factors conflict, and thus it is unclear from the record·before us and the Commis-

sion may reexamine the evidentiary record, and if necessary gather further evidence required for a proper resolution of this issue.

## VI. CONCLUSION

In summary, we hold that the Commission is not estopped from prosecuting this action, that it properly allocated the burden of proof in its proceedings below, and that Stowers and Investors Research were each "acting as an agent" when they received compensation forbidden by section 17(e)(1). Further, we hold that scienter is not an element of a principal violation of section 17(e)(1). We therefore affirm the Commission's order of censure against Stowers and Investors Research (No. 78–1589).

As to petitioner Driehaus, we hold that the Commission was required to make findings on the question of the requisite state of mind for aiders and abettors. We therefore vacate the Commission's order in No. 78–1597 and remand for such further proceedings as may be necessary to adequately address the issue of state of mind as set forth herein.[66]

*So ordered.*

sion's findings whether Driehaus indeed "had a general awareness that his role was part of an overall activity that was improper."

**66.** Petitioners' remaining contentions have been considered and found to be without merit.